## SUPREME COURT.

GEORGE W. COTHRAN, appellant agt. SARAH A. COLLINS, respondent.

Where the court is satisfied upon the *whole evidence* in the case that the verdict of the jury is not in accordance with the real truth of the case, yet where it is not so flagrant as to show passion, prejudice or inattention to their duty on the part of the jury, there is no modern authority which gives the court power to disturb the verdict.

*Erie General Term, May,* 1865.

*Before* GROVER, *P. J.,* DANIELS *and* MARVIN, *Justices.*

APPEAL from an order of the special term denying motion for new trial on a case. For a statement of the facts and evidence in this case see next *ante.*

After the exceptions in this case, which were ordered to be heard at general term in the first instance, had been argued, and previous to a decision thereof, the plaintiff noticed a motion at special term for a new trial on a case, on the ground that the verdict was against evidence. The defendant, at the term at which this motion was noticed, made a motion to strike the cause from the special term calendar, and for leave to re-settle the case. The latter part of this motion was granted, and the case was re-settled. The plaintiff then noticed a motion for a new trial at special term on the case as re-settled, which motion was denied *pro forma*, without argument. From the order entered pursuant to this decision, plaintiff appealed to the general term Before the appeal was heard, defendant made a motion at general term to dismiss the appeal, on the ground that the court had no power to hear a motion on a case for a new trial, after having heard a motion for a new trial on exceptions ordered to be heard at general term in first instance. This motion was heard at general term, and at Erie November (1864) general term was denied, on which occasion an able opinion was delivered by Judge DANIELS. The appeal was heard at that term.

GEO. W. COTHRAN, *appellant in person.*

I. The verdict is contrary to the evidence.

1. Defendant knew the note was held by plaintiff until long after maturity. (*Case, fol. 53 to 55, Mrs. Cothran's testimony.*) At folio 33 defendant testifies: "I think I was at his (plaintiff's) house within three days after giving of note." (The note was given July 27, 1862.) "I cannot tell when I was there next; think in the fall; I was there in January; was there again in February; Mrs. Cothran told me she had the $2,400 note; this was not long after plaintiff left for the army—not more than a month; it was also spoken of when I was there a day or

Cothran agt. Collins.

two after the note was given." (Plaintiff left for the army August 14, 1862.) Again at folio 43, she testifies: "His mother told me she had the note soon after it was given; I do not recollect conversation about note in December nor in January; am quite positive I had none, but will not swear I did not have such conversation." This is all there is in the case which tends in the least to contradict Mrs. Cothran's testimony. At folio 50, she writes to plaintiff: "I received a line by Mina from your mother, by which I understand there was a misunderstanding in reference to a remark I made about the note I gave you. I had not the slightest idea that *you intended to dispose of it in any way*, so let the matter drop until I see you."

If she was not excessively anxious to know whether or not the note was to be transferred, why should she follow it up so closely. "A day or two after the note was given" (*fol.* 33), we find her inquiring about it of plaintiff's mother. *Of course* she "had not the slightest idea that plaintiff intended to dispose of it in any way," which is fully evidenced by her inquiries within two days after it was given, as well as the repeated inquiries testified to by Mrs. Cothran, subsequently. We can all appreciate this now, judged by the light of subsequent events. Does this not indicate that she had already conceived the scheme which I shall soon show she carried into execution? But there is further evidence on this point. At folio 69, she testifies: "The letter written by Mrs. Cothran's grand-daughter, was written partly to my little girl, and was not kept; *it was that she, Mrs. Cothran, did not intend to transfer the note* to Mr. Mann; I wrote in reply the letter of August 11; *I did not intend to say anything of transferring the note.*" And why not? Simply because she intended to keep her designs secret from plaintiff. This evidence establishes the facts beyond doubt that she knew the note was held by plaintiff over six months past due, and that it was understood between her and plaintiff and his mother, that the note was

not to be transferred at all. For defendant testifies that Mrs. Cothran told her "she had it, and then that she told her that she did not intend to transfer it." Nothing can be more clear and emphatic than this.

2. The payment was made seven months past maturity. The note is dated July 15, 1862, payable in twenty days, and was paid February 16, 1863.

3. The payment was made at a time and under circumstances which impeach its *bona fides.* In addition to what we have just shown, she knew at time of payment that plaintiff was in the army in Virginia. Mrs. Cothran testifies, that she told defendant's daughter in January, that she had received a letter from plaintiff requesting her to have defendant pay on the note, and that her daughter said, " it is no use, mother cannot raise it," which interview she subsequently related·to defendant, and " she said she could not pay." This must have been on 17th January, or 3d or 4th of February, as those were the days when defendant was at Mrs. Cothran's house. This is not denied anywhere by defendant.

*a.* The defendant testifies, that she retained $700 of the Nichols draft which she got in September, 1862, and used it in February, to pay on this note. She also testified, that early in January she got $600 of Mrs. Stevenson, and $300 more on the 17th, and $300 more February 3d; and also that she had $150 or $200 left after paying the $1,900 February 16, without showing that she subsequently acquired it. It is safe, therefore, to assume that at the time she told Mrs. Cothran "that she could not pay," she had on hand from $1,600 to $1,900. Which of these stories shall we believe? Suppose we believe the first. Then her claim of payment is a fiction, for she had no money to pay with. Suppose we take the latter. Then she deliberately told a falsehood to Mrs. Cothran. Suppose we take the statements just as they are together, and what then? Do they not most clearly show that she did

Cothran agt. Collins.

not intend to pay Mrs. Cothran anything on the note, and that "there is something rotten in the state of Denmark?" And again : Defendant testifies that this stranger to whom she paid the note, presented it to her in Rochester, February 6th, and that she paid it on the 16th. She had been at Mrs. Cothran's February 3d, and remained over night, leaving on the 4th. The circumstances under which payment was made, as detailed by herself, show an utter absence of good faith.

*b.* She "took counsel of her attorney." And what was that "counsel?" "I asked Townsend if a note I had given to a person or bearer, I would be liable to pay to a person holding it?" and "counsel said I would be obliged to pay the note to any one presenting it." This was a mere abstract proposition, and totally disconnected from this note. For she testifies, "I did not see any one except Townsend and Booth after the man was there before I paid the note. *I did not tell either of them about the note.*" Is it not a little singular that she should take counsel of her attorney, and at the same time conceal from him all the facts of the case. Does it not indicate that she had an ulterior object in view ?

*c.* At folio 34 she testifies, that when this stranger first called on her "he presented the note." * * * "I told him it was my note." She unquestionably had the note in her hands. It is undisputed that it had the name of the plaintiff indorsed on it, and which was a forgery. If there be any semblance of good faith in this transaction, then it is impossible to establish by human testimony a want of good faith. But the counsel will answer, this precise question was submitted to the jury, and they have found in favor of the defendant. To which we reply, that this finding is totally unsupported by evidence. True, the defendant testifies, "the payment by me was in good faith." But what avails the mere statement of the accused party

that she acted in good. faith, when every circumstance attending the transaction goes to prove the contrary ?

. II. That the note was stolen from plaintiff's house by some person, is no where controverted in the case. We contend that the evidence fully warrants us in claiming that the defendant is that identical person. The note was given by plaintiff to his mother to hold for him, August 14th or 15th, 1862. She put it into a drawer in her bureau in which she kept her private papers, locked the drawer and hid the key in a lower draw under some clothing. It was not seen by her or plaintiff again until January 12, 1863. On that day plaintiff saw it, and also Mrs. Cothran. Plaintiff handed it back to her, and she replaced it in the drawer and locked it. It was next seen by her and plaintiff March 13, at defendant's house in Rochester, in defendant's possession. Defendant was quite intimate in Mrs. Cothran's house. January 17, defendant came to Mrs. C's. house and remained over from Saturday until Monday— " came alone, and staid and slept alone in the room where the bureau was." * * * " She came February 3, and staid over night, and slept alone in the same room."

During the interval from January 12 to February 16, several persons were at Mrs. Cothran's, each of whom was called, and testified that they knew nothing about the note, and did not take it. During January and February, there lay loose in the same drawer with this note, $43 in gold and silver. Bearing in mind the frequency of her inquiries concerning the note, and her extreme anxiety about its being transferred, and her marked satisfaction on ascertaining that it was to be kept by Mrs. Cothran; and then that she had all the opportunities necessary to commit the larceny; the extremely suspicious circumstances attending the alleged payment; the fact that after the discovery of the larceny the note was found in her possession mutilated, and with a forged indorsement of plaintiff's name upon it, together with her most singular letter of March 9, 1863,

Cothran agt. Collins.

how is it possible for any honest mind to come to any other conclusion than that she is guilty of the larceny herself. Then add to all this the small but yet the most momentous fact in the case, that the gold and silver that lay loose in the same drawer was not taken, and the note was—a promissory note over six months due.

Does the history of criminal jurisprudence furnish a parallel case ? that an ordinary or even extraordinary thief would prefer to steal a promissory note long past due to gold and silver, when they were equally within her reach ? the one immediately available, and the other extremely doubtful ? Had any other person than the defendant taken that note, do you believe that the gold and silver would have remained there a silent yet terribly expressive witness against the guilty party ? Far from it. The conclusion that she is the party is irresistable. Upon this evidence, were she upon trial on an indictment for the larceny, a jury that would not convict her would fail to do its duty.

What is there to contradict or off-set this avalanche of proof ? The declaration of the defendant that " she did not take it." If she did not take it, why did she not produce this convenient yet mysterious stranger, and show where he got it. How many criminals—" the real hardened, wicked "—but that, were they permitted to go on the witness' stand as she was, would testify precisely as she did, assuming that she stole it ? Very few, indeed, for the party who will commit larceny will commit perjury to screen herself from the consequences of her acts. It does seem to me that as against all this evidence her simple denial is insufficient to sustain a verdict.

*a.* But let us go further and *suppose* she did steal it, as from the evidence we firmly believe she did, what then ? The first thing to be done after acquiring possession of it, was to manufacture a defence, to avoid the enforcement by the plaintiff of his demand, the justness of which is undisputed. What conceivable defence could be manufactured

VOL. XXIX.                    11

that would defeat the plaintiff's recovering his just demand ?
The defence of payment ?   You may ransack the law from
Bracton to the present moment, and you will find none.
Having acquired possession of the note, she goes to work,
seeks her counsel, and puts to him this query : " I asked
Townsend if a note I had given to a person or bearer, I
would be liable to pay to a person holding it ?" and the
" counsel said I would be obliged to pay the note to any
one presenting it." We have already seen that she cau-
tiously withheld from him every fact concerning this note.
She knew only too well what that counsel would have said
had she told him the truth and the whole truth.   But she
only wanted to make a single inquiry, so that she could
swear she acted under advice of her counsel; that was all.

The next step to be taken was to procure evidence of
this payment. Who could she trust but her daughter, who
resided under her own roof.   She then gets a stranger
" whom she had never seen before," to come to her house
with the note, and the formalities of payment are gone
through with.   The note signed by Marsh was only intro-
duced to give the transaction the color of probability.
See how artfully the scheme was planned : This " stran-
ger" was not to be seen by her daughter but once.   De-
fendant says he was at her house on the 6th and again on
the 16th of February.   Her daughter saw him only on the
last occasion, and strange it is too that nobody else saw
him at all, either in her house or anywhere else.   Defend-
ant followed him to her door, and presto, he is invisible ;
the scheme is complete ! The note has been paid, and she
has evidence of the payment.   Not satisfied with all this
—for a criminal is never satisfied, that she is beyond detec-
tion—she straightway goes and makes a memorandum of
the occurrence, " to make assurance doubly sure."

She testifies : " I got the date of this man's calling from
journal, on which *I entered it as a circumstance that I might
want to fix the date* " of.   If the payment had been a real

honest transaction, what was the necessity of this memorandum? She held the note. Does not the fact of the making this memorandum "as a circumstance that she might want to fix the date" of, furnish very strong evidence that the whole occurrence was a mere fabrication? She evidently was fearful that she would be found out, and sought to multiply safeguards. The Duke of Cumberland once remarked, that "there is a moral in a villain's outwitting himself."

*b.* When on March 9th, she was written to by plaintiff to pay him, she writes in answer: "Your letter was received in due time. The entire letter was inexplicable. *You may not have known the note was paid,* but you must have known that I would have been most likely obliged to pay it before this time. I paid it about the first of February, to a man who said he resided in Buffalo. I did not know him. I paid him $1,900 in cash, and the balance in a note payable in three years." Why does she say "you may not have known the note was paid," if she did not know there was something wrong in the transaction? She knew full well, as we have seen, that the note was not to be transferred, and when she wrote this letter, for the time being she was gravely in doubt how the plea of payment would answer, for the mind of every guilty party is troubled by suspicions that their wrongful deeds may be brought to light. Viewed thus, can there be a doubt that the defendant took this note from plaintiff's house? And as matter of law, the party claiming upon or by virtue of a lost or stolen note, is bound to show satisfactorily how she came by it. The onus rests with her (2 *Parsons on Bills,* 280-1).

III. The payment was made with notice of the infirmity of the holder's title (2 *Parsons on Bills and Notes,* 279).

IV. The protection that the law merchant throws around commercial paper, applies exclusively to paper transferred prior to maturity (2 *Parsons on Bills,* 279). A note past

Cothran agt. Collins.

due is a mere liquidated account, and when payable to bearer the title passes by delivery. It does not differ in any essential particular from an ordinary liquidated demand, for it is well settled that the title to an account, when transferred for value, passes without assignment, precisely the same as a note payable to bearer. (*Prescott* agt. *Hull*, 17 *J. R.* 284; *Canfield* agt. *Munger*, 12 *J. R.* 346; *Code of Procedure*, § 111 *and notes*.). Therefore the law applicable to choses in action, to personal property, is strictly applicable to negotiable paper when past due. And on the sale of an ordinary chose in action, or an article of personal property, the vendor can convey no greater or other title than he has himself. This is elementary.

V. That the note was stolen from Mrs. Cothran's house by some person, is proven beyond doubt. After the larceny it first turns up, according to the defendant's testimony, in the hands of this strange man Judson. That it came to his hands when long past maturity, is uncontradicted. There could, therefore, be no transfer of it to a *bona fide* holder so as to pass title, as it bore upon its face evidence of dishonor, being over due. (2 *Parsons on Notes and Bills*, 279; *Chitty on Bills*, 290, 254 *marginal paging*.)

The note having been stolen when past due, and it is immaterial whether Judson was the thief or had acquired it by purchase—he was a wrongful holder as against the plaintiff, the party in interest, and on a sale of the note could *convey* no better title to it than he had (*Ross* agt. *Cassidy*, 27 *How. Pr. R.* 416). For being a wrongful holder, he could not rightfully convey it. And replevin would lie against him even after he had parted with it, and that although he had acquired it for value, without actual notice of the larceny, and had conveyed it in like manner (*Ross* agt. *Cassidy*, 27 *How. Pr. R.* 416).

VI. To render the payment of a note to a mere holder effectual as against the party in interest, such payment must be a payment within the protection of the law mer-

chant. · To render such payment an extinguishment of the note, it must be made in due course of business, which has been judicially determined to be a payment at maturity, and at the place of payment designated in the note and to the lawful holder. (2 *Parsons on Bills and Notes*, 208, 279 ; *Story on Promissory Notes* § 380 ; *Chitty on Bills*, 446, *marginal page*, 395.)

This note was payable at a bank in Lockport, and was paid in Rochester, seven months past maturity. Payment of a note out of the usual course of business, is always at the peril of the party paying. (*Byles on Bills*, 288, 4*th ed.* ; 2 *Parsons on Bills*, 212.) There is no valid distinction known to the law between the rule applicable to the transfer of a note past due, and the payment of a note past due. If there be any such discrimination, it is against the party paying (*Byles on Bills*, 288, *note h*).

Will it be contended that if A should wrongfully take an account belonging to B against C, and present it and receive payment of C, that such payment would be good as against B ? Most certainly not. A promissory note past due, payable to bearer, is no higher or greater security than a liquidated account—being the mere evidence of a liquidated chose in action, and carrying with it the evidence of dishonor on its face. I deny that there is any rule of law in England or in the United States, giving greater effect to the payment of such a note than to the payment of an ordinary account.

VII. The verdict should be set aside and a new trial granted.

S. E. CHURCH, *for respondent.*

I. The evidence of the plaintiff alone would scarcely sustain a motion of this character.

1. There is no evidence that the note was seen in possession of plaintiff's mother, except on the 12th of January.

2. There is no evidence that the defendant knew where the note was kept, or that it was kept in the bureau, much less in any particular drawer; nor that she knew that papers of any kind were kept in the drawer. On the con trary, the evidence tends to show that the books and papers were up stairs. There is no evidence that the drawer was ever opened in her presence, or that she had any knowledge of the key or where it was kept, nor would she be likely to find it hid away under the clothes in the large drawer.

3. True, the defendant was there and slept in the room where the drawer was; so had several others. The defendant had been in the habit of going there since 1858, occasionally.

4. The house was frequently left alone, and the key left on the outside. Once the key was lost for two weeks. Once during the winter, the front door was found open in the morning.

II. But the defendant's evidence if true, establishes a perfect defence to this action.

1. She paid the note on the 16th of February, 1863, by cash $1,900, note indorsed by Marsh for $500. She paid it to a man calling himself Mr. Judson, *from Buffalo*. This man first called on the 6th of February, and told her he would be down again in two weeks, during which time she would see what could be done. In the mean time she advised with Mr. Townsend, a lawyer, borrowed a part of the money of Mr. Booth, which, with other moneys that she had borrowed to pay on a mortgage which was being pressed, she made the payment. She says: "I did not take this note from the house of Mrs. Cothran, or conspire to have it done, nor knew anything about it; the payment by me was in good faith."

2. The defendant's testimony was corroborated by Martha Collins, her daughter, who was present and saw the money paid, and procured the note to be signed by Marsh. Also by Mr. Marsh, who signed the note of $500 for defend-

ant.   Also by Mr. Booth, who held title of land of defendant, subject to a mortgage of $10,000, a payment on which had to be made.   He expected that defendant would pay the mortgage ; he lent her $300, but he was obliged to pay it himself, because she had used the money to pay the note. Also by Mrs. Stevenson, who let her have $1,100 at different times to pay on this mortgage, but which was used to pay note.

· III. If the defendant did not steal the note herself, there can be no question but she paid it in good faith.

1. She knew that plaintiff wanted the money on the note.

2. The person that bought it offered to throw off the interest as an inducement.

3. She had the money sufficient to pay it, although obtained for another purpose.

4. She advised with a lawyer as to paying it.

5. She swears that she paid it in good faith.

6. Every presumption is in favor of good faith.

IV.   The plaintiff's evidence is circumstantial and uncertain; the defendant's positive and certain.   The jury saw and heard the witnesses; they saw the miserable attempt to impeach the defendant, and how she was sustained by the most respectable citizens of Rochester, who had known her for more than twenty years, and they decided in view of all the facts in her favor.   It is submitted with great confidence that the jury could not have decided otherwise, and to ask the court to interfere in such a case is the height of professional impudence.

V.   The rules of law on this subject are founded in good sense, and are decisive against this motion.   When there is a conflict of evidence, the court will not grant a new trial on the ground that the verdict is against evidence, even though they deem the conclusion reached by the jury erroneous.   (*Mackey* agt. *N. Y. C. R. R. Co.* 27 *Barb.* 528 ; *Stoddard* agt. *L. I. R. R. Co.* 5 *Sand.* 180 ; *Adsit* agt. *Wil-*

*son,* 7 *How. Pr.* 64 ; *Winchell* agt. *Latham,* 6 *Cowen,* 682 ; *Fleming* agt. *Hallenbeck,* 7 *Barb.* 271.)

To set aside a verdict when there has been evidence on both sides, there must be such a preponderance of evidence as to satisfy the court that there was either an absolute mistake on the part of the jury, or that they acted under the influence of prejudice, passion or corruption (*Cohen* agt. *Dupont,* 1 *Sand.* 260). " The law does not regard the judges as possessing any superior qualifications over jurors for judging of facts, or the weight or form of evidence of facts. It is a safe and favorite principle of our jurisprudence that the facts are to be tried by a jury, and that the mere facts of a cause when once fully and fairly tried, are not to be reviewed " (*Per* MULLETT, 7 *How. Pr.* 66). The court will not set aside a verdict on a question of fact, even if it is contrary to the charge of the circuit judge. (*Astor* agt. *Union Ins. Co.* 7 *Cow.* 202 ; *see also The Traders' Bank* agt. *Shattenkirk,* 3 *J. R.* 170 ; *Ward* agt. *Carter, Id.* 271 ; *Astor* agt. *Union Ins. Co.* 7 *Cow.* 202 ; *Douglass* agt. *Tousey,* 2 *Wend.* 352 ; *Lewis* agt. *Payne,* 4 *Wend.* 423 ; *Rice* agt. *Welling,* 5 *Wend.* 595 ; *Jackson* agt. *Timmerman,* 12 *Wend.* 299 ; *Mansfield* agt. *Wheeler,* 23 *Wend.* 79 ; *Fleming* agt. *Hallenback,* 7 *Barb.* 271 ; *Fox* agt. *Jackson,* 8 *Barb.* 355 ; *Horner* agt. *Wood,* 16 *Barb.* 386.)

In tortious actions the rule is still more stringent, and the same rule should be applied to *tortious questions.* (*Jains* agt. *Hathaway,* 3 *J. R.* 180 ; *Hunter* agt. *Hopkins,* 9 *J. R.* 36 ; *Randell* agt. *Butler,* 10 *Wend.* 119 ; *Sawyer* agt. *Smith,* 1 *Denio,* 207.)

VI. The motion should be denied with costs.

GROVER, J. The questions of law arising upon the exceptions taken upon the trial, have already been disposed of by the court. The only question now before the court arises upon an appeal from an order of special term denying a motion of the plaintiff to set aside the verdict and

grant a new trial, upon the ground that the verdict was against the evidence. The question of fact litigated upon the trial was, whether the payment of the note by the defendant was made in good faith. I have carefully examined all the evidence bearing upon this point. The circumstances established by unquestioned evidence, tend strongly to show that it was not. The note, providing for the payment of semi-annual interest, although it had but twenty days to run, shows pretty clearly that it was then understood by the defendant that it would be retained by the plaintiff, and the defendant would not be called on for payment for some considerable time. The anxiety shown by the defendant on several occasions, that the plaintiff should not transfer the note, and the satisfaction expressed by her at the note's being left with the plaintiff's mother while he was absent in the army, show a strong wish, at least, that the plaintiff should retain the note, and a desire on her part further to defer the payment. Knowledge by the defendant that the plaintiff was absent in the army, which is inferrible fairly from the evidence, at the time of the alleged transfer, is a pretty strong circumstance against the good faith of the defendant.

The defendant's testimony that a perfect stranger from Buffalo presents himself to her with the note, and at once tells her he has got it in such a way that if promptly paid he can throw off the interest, is another fact of the same nature. It must be borne in mind that the note was at this time past due, and there does not appear to have been any talk between the defendant and this stranger as to her ability and willingness at once to pay the note, before the stranger's making this proposition.

The fact that the note was stolen from the possession of the plaintiff's mother, which no one from a perusal of the evidence can doubt, coupled with the opportunity of the defendant to take it, throws great doubt upon the *bona fides* of the defendant in making the payment. This evi-

dence is met by the defendant's positive testimony that she did not steal the note, and had at the time of payment no knowledge or suspicion that it had been stolen, and that she made such payment in good faith. It was also shown upon the part of the defendant, that persons other than the defendant might have entered the room where the note was kept, and might have stolen it. I do not regard the fact of payment to the stranger, in presence of the defendant's daughter, the form of which was undoubtedly gone through, or procuring the note of $500, which was used in making such payment, as entitled to much weight. This would have been done upon the theory that the defendant herself abstracted the note, equally as though some other person without her knowledge or privity had done it.

Upon the whole evidence, my impression is strong that the verdict was not in accordance with the real truth of the case. Yet I am not prepared to say that the case is so flagrant as to show passion, prejudice or inattention to their duty, on the part of the jury. There is the positive testimony of one witness in support of the verdict. The evidence against it is circumstantial, and although to my mind of a convincing character, it would be going further than any modern reported case authorizes, to set aside the verdict rendered.

The order appealed from must be affirmed

DANIELS and MARVIN, JJ., concurred.